IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ROBERT MONTGOMERY,

    Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, COLORADO, a body corporate and politic, and
WESLEY A. RIBER, in his individual capacity,

    Defendants.
_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Robert Montgomery, through his counsel, the law firm of Benezra & Culver, L.L.C., for his Complaint and Jury Demand, alleges the following:

## I. INTRODUCTION

1. Robert Montgomery is the former highly-regarded Assistant Chief Deputy Coroner of Douglas County. Despite his outstanding performance, Mr. Montgomery was fired because he spoke out on matters of public concern, including his opposition to the possible cover-up by Defendant and County Coroner, Wesley Riber, of the suicide of a political ally's brother, as well as Riber's abuse of his position for personal financial gain. The reasons asserted by Riber for Mr. Montgomery's termination are mere pretexts to cover-up Defendants' retaliation. Arising from those allegations, Mr. Montgomery's Complaint alleges that his termination violated the First Amendment's Freedom of Speech pursuant to 42 U.S.C. § 1983.

1

## II. JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the unlawful employment practices alleged herein were committed within the State of Colorado.

## III. PARTIES

3. At all relevant times, Robert Montgomery has resided in Douglas County, Colorado.

4. Defendant Board of County Commissioners of Douglas County ("BOCC") is a body corporate and politic that may be sued under Colorado law.

5. Defendant Wesley Riber is the Douglas County Coroner who presently resides in Douglas County.

## IV. ALLEGATIONS

6. Plaintiff Montgomery was employed by the Douglas County Coroner's Office for four years, most recently as Assistant Chief Deputy Coroner. Throughout his tenure, Mr. Montgomery served with distinction and was promoted three times.

7. In his most recent and final performance review, Mr. Montgomery was rated as Highly Proficient. Because of his outstanding performance in 2006, County Coroner, Wes Riber, recommended that Mr. Montgomery receive an annual raise in excess of the standard 3.5% increase. That request was approved and Mr. Montgomery received an almost 12% raise. Numerous commendations were

2

mentioned in both his 2006 review and the pay raise recommendation, including his participation in various governmental committees.

8. Mr. Montgomery was so highly regarded that Mr. Riber and others in the Republican Party told Mr. Montgomery that he would receive their backing to replace Mr. Riber as Coroner in the 2009 election.

9. In November of 2006, Mr. Montgomery became concerned that Coroner Riber may be attempting to cover-up the possible suicide of Jack Acree, who had died on October 23, 2006. Not coincidentally, Jack Acree was the brother of Mike Acree, who was the former Douglas County Sheriff and a close political ally of Coroner Riber's, who was elected on the same ticket in 2002.

10. Inconsistent with office practice, Coroner Riber and Chief Deputy Coroner Patricia Dunn placed themselves in charge of the investigation into Acree's death. Mr. Montgomery had no responsibility for that investigation.

11. Despite the fact that suicide notes and instructions regarding his burial were found on the scene, Riber ruled Acree's death to be natural.

12. Fearing a cover-up, Mr. Montgomery repeatedly asked Riber and Dunn to quantify the amount of a drug that had been found in Acree's system at the time of death. The quantification was significant, because Mr. Montgomery believed the drug, in combination with other drugs found in Acree's system, could have caused the heart failure that Riber identified as the "natural" cause of death.

13. In approximately February of 2007, Mr. Montgomery discussed the Acree case for the last time. Mr. Montgomery told Riber that he should just go ahead and quantify the drug. According to Mr. Montgomery, if the drug did not contribute to the

death, it would verify Riber's evaluation. However, Mr. Montgomery suggested that if the test wasn't run, it would look like a cover-up.

14. After voicing his concerns about a possible cover-up, Riber reacted with hostility, told Mr. Montgomery that he was done with the case, and would not honor his request. Mr. Montgomery's relationship with Mr. Riber was never the same.

15. Mr. Montgomery had a good faith basis to believe that Acree's death was a suicide. A case report created by the Douglas County Sheriff's Office indicates that three suicide notes were found in Acree's residence at the time of his death. A progress report generated by the County Sheriff's Office concluded that:

> While Jack Acree did have prior [_____] conditions, the facts of this case do not support a natural death. It appears that the combination of the drugs in his system caused his death. Therefore, this case will be closed as a suicide by the Douglas County Sheriff's Office.

16. Similarly, Mr. Montgomery had a good faith basis to believe that Riber was covering up the suicide of his ally's brother. During its investigation of Acree's death, the Sheriff's Department was told that Riber was in a "power struggle" with the new County Sheriff and that Riber ruled his death a natural death in hopes of "gaining political favor."

17. In late April of 2007, Mr. Montgomery discovered additional possible wrongdoing by Mr. Riber and Ms. Dunn. Specifically, the County Coroner's Office provides autopsy services to small counties in Colorado at a highly discounted fee. On several occasions during Mr. Montgomery's tenure, Mr. Riber, Ms. Dunn, and Mr. Montgomery discussed whether that fee should increase. Riber and Dunn always advocated that it continue at the same discounted rate.

4

18. Apparently, they were in favor of the discounted fee, because Mr. Riber and Ms. Dunn personally benefited from it. In April of 2007, Mr. Montgomery learned that Mr. Riber and Ms. Dunn had been accepting money from the pathologist used to perform out of county autopsies for serving as assistants or "deaners."

19. When Mr. Montgomery informed Ms. Dunn that he had learned that she and Riber were paid as deaners on out of county cases, she responded, "Well, who let the cat out of the bag?"

20. Mr. Montgomery responded to Ms. Dunn that he did not think it was appropriate for her and Mr. Riber to accept money to assist on out-of-County deaning cases. He told her that the practice created the appearance that she and Riber were using their positions to benefit themselves financially, as they were the principal negotiators of the Douglas County contract for the pathologist.

21. Ms. Dunn reacted with hostility to Mr. Montgomery's words regarding her and Riber's conflict of interest. From that date on, Mr. Riber and Ms. Dunn barely spoke to Mr. Montgomery.

22. Soon thereafter, on May 22, 2007, Mr. Montgomery was suspended based on an interaction with a Coroner Investigator and an Administrative Clerk. Even though the allegations are largely untrue, no investigation was conducted into the allegations and Mr. Montgomery was not given an opportunity to respond to the charges. Instead of using progressive discipline, on May 29, 2007, Mr. Montgomery's employment was terminated.

23. The County's conduct subsequent to Mr. Montgomery's termination further demonstrates the County's retaliatory intent. On approximately July 2, 2007, Mr. Riber

contacted the State Homeland Security Fatalities Committee on which Mr. Montgomery served as Co-Chair and told it that Douglas County would pull out of the Committee if Mr. Montgomery was permitted to continue to attend monthly meetings.

## V. CLAIM FOR RELIEF

**Abridgement of First Amendment Freedom of Speech
Pursuant to 42 U.S.C. §1983
(Against Both Defendants)**

24. Plaintiff hereby incorporates paragraphs 1 through 24 above as though fully set forth herein.

25. Plaintiff Montgomery's speech regarding the Acree and deaning matter was not expressed during the ordinary course of his job responsibilities.

26. Plaintiff Montgomery exercised his right to freedom of speech as afforded by the First Amendment to the United States Constitution by speaking out on matters of public concern.

27. The value of Mr. Montgomery's speech outweighs any possible negative or disruptive impact on the Defendants' performance of public services.

28. Defendants intentionally and willfully retaliated against Plaintiff for exercising his freedom of speech.

29. Defendants' retaliatory conduct was substantially motivated by Plaintiff's exercise of freedom of speech and association.

30. Defendant Riber's conduct violated the clearly established rights of Plaintiff of which reasonable persons in Defendant's positions should have known.

31. The aforementioned conduct represented the official custom, policy, or practice of Defendant BOCC.

32. Defendant Riber's conduct was willful and wanton and engaged in maliciously or with reckless disregard or callous indifference to Plaintiff's protected rights, as well as to his rights and feelings.

33. As a result of Defendants' misconduct, Mr. Montgomery has been damaged.

WHEREFORE, Plaintiff Montgomery respectfully requests that this Court enter judgment in his behalf and against Defendants and award him the following:

(a) injunctive and declaratory relief;

(b) damages in such amount as will be proven at trial for back-pay, and damages including lost benefits, wages, promotions, tenure, seniority and other employment opportunities;

(c) an order to reinstate Mr. Montgomery or, in the alternative, to pay front-pay and benefits in an appropriate amount;

(d) compensatory damages, including for emotional distress, as allowed by law;

(e) punitive and exemplary damages as allowed by law against Defendant Riber only;

(f) attorney fees and costs as provided for by law; and

(g) pre- and post-judgment interest, costs and expert witness fees, and such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 16th day of January, 2008.

**BENEZRA & CULVER, L.L.C.**

**s/John A. Culver**
_____
John A. Culver, Esq.
Seth J. Benezra, Esq.
274 Union Blvd., #220
Lakewood, CO 80228-1835
303/716-0254

<u>Plaintiff's Address</u>
122 Baldwin Court
Castle Rock, CO 80104