**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 08-cv-00108-WYD-MEH

ROBERT MONTGOMERY,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY, COLORADO, a body corporate and politic, and
WESLEY A. RIBER, in his individual capacity,

      Defendants.

---

**COMBINED MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM BRIEF IN SUPPORT OF THEREOF**

---

Defendants, **BOARD OF COUNTY COMMISSIONERS OF DOUGLAS COUNTY** and **WESLEY A. RIBER**, through undersigned counsel and pursuant to Fed.R.Civ.P. 56, hereby move the Court for summary judgment in their favor with respect to Plaintiff's sole claim for First Amendment retaliation under 42 U.S.C. § 1983.

      **AND IN SUPPORT THEREOF**, Defendants state as follows:

## I.     <u>INTRODUCTION</u>

      In December of 2002, the Plaintiff in this case, Robert Montgomery ("Montgomery"), was hired by Douglas County Coroner Wesley Riber ("Riber") as a coroner's office specialist involved in various administrative duties. Later, Montgomery applied for and was promoted to the position of coroner investigator, and subsequently was promoted to senior investigator. When terminated by Riber on May 29, 2007, Montgomery held the position of assistant chief deputy coroner.

Although it is undisputed that Montgomery received satisfactory performance evaluations during the time frame when he was being promoted within the coroner's office, the facts show that once he was promoted into the assistant chief deputy position, Montgomery began to abuse the authority of his rank in ways that were highly detrimental to the agency. As will be detailed below, over a period of approximately eight months commencing in September of 2006, Riber received repeated complaints from both outside agencies and coroner's office staff about inappropriate and disruptive conduct on the part of Montgomery. When confronted with these complaints, Montgomery uniformly disclaimed any impropriety on his part and steadfastly refused Riber's requests for change. In the end, when Montgomery returned from a brief administrative leave designed to cause him to reflect on his conduct still proclaiming no need for change, Riber was left with little choice but to terminate Montgomery's employment as was his prerogative.

Montgomery's theory of the case is that he was terminated in retaliation for speaking out regarding two matters, a death investigation that was ruled a natural cause death (when Montgomery believed it should have been ruled a suicide) and his assertion that Riber and the Chief Deputy Coroner, Patricia Dunn ("Dunn"), were in a conflict of interest for accepting *de minimis* fees for assisting with out-of-county autopsies. This theory fails as a matter of law for two reasons. First, both matters fall within Montgomery's official duties and he is, therefore, barred from asserting a claim under the First Amendment. Second, there are no facts demonstrating any causal link between Montgomery's alleged acts of speaking out and his termination, thereby rendering his attempted linkage to be pure speculation. For these reasons, summary judgment should enter for defendants.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment should be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving parties are entitled to judgment as a matter of law. *See, Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110-11 (10th Cir. 1991). Upon a motion for summary judgment, the moving parties bear the burden of showing the absence of a genuine issue of material fact. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to produce evidence creating a genuine issue of material fact to be resolved at trial. *See, Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). The non-movant must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

## III. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUF")</u>

1.      Riber was elected Douglas County Coroner in 2002, currently holds this position, and is the final decision maker concerning staffing of at-will employees in the Coroner's Office. [*See*, Affidavit of Wesley A. Riber, appended hereto as **Exhibit A-1**, at ¶ 1; Affidavit of Laura Teague, appended hereto as **Exhibit A-2**, at ¶¶ 2, 3, 4, 5, and 6; Douglas County Employee Handbook, appended hereto as **Exhibit A-3**, at DCCO.Montgomery 00047, 00075.]

2.      Riber hired Montgomery on December 23, 2002 as an administrative assistant, and as an at-will employee. [*See*, **Exhibit A-1**, at ¶¶ 1, 3**;** Transcript of Deposition of Robert Morgan Montgomery, appended hereto as **Exhibit A-5**, at 164:1-5; 166:11-18.]

3.      After a series of promotions, Montgomery was promoted to the position of

assistant chief deputy coroner, the position he held during his last performance evaluation on August 21, 2006, as well as when he was terminated on May 29, 2007. [*See*, **Exhibit A-1**, at ¶¶ 1, 3, 4, and 5; Job Description of Assistant Chief Deputy Coroner, appended hereto as **Exhibit A-4**.]

4.      Montgomery conducted death investigations of his own in his role as Assistant Chief Deputy Coroner and also worked with Riber and Dunn with respect to review of cases. [*See*, **Exhibit A-5**, at 63:5-19.]

5.      It was part of Montgomery's job to speak with representatives of the Douglas County Sheriff's Office and exchange information with them because they frequently worked on the same investigations.  [*See*, **Exhibit A-5**, at 68:6-69:3.]

6.      It was part of Montgomery's job to report his activities and what those who were under his charge were doing to the Chief Deputy Coroner, and in this regard, Montgomery spoke regularly with both the Dunn, his immediate supervisor, and the Coroner, Riber, who was ultimately Montgomery's supervisor.  [*See*, **Exhibit A-5**, at 69:4-70:25.]

7.      The assistant chief deputy coroner position, which Montgomery held, "is a technical and administrative position providing oversight and supervision related to investigating deaths occurring within the jurisdiction of the Douglas County Coroner's Office".  [*See*, **Exhibit A-4**, at RM 0102, Definition/Scope of Work; **Exhibit A-5**, at 71:23-72:21.]

8.      As part of his job, Montgomery was required to advise the "Chief Deputy Coroner on manpower and personnel matters" and to provide "review and oversight of case files, judicial filing, medical reports and police and/or fire reports."  [*See*, **Exhibit A-4**, at RM 0103; **Exhibit A-5**, at 72:22-74:13.]

9.      It was also part of Montgomery's job to determine when autopsies are needed and to confer with medical, social and law enforcement agencies related to investigations.  [*See*, **Exhibit A-4**, at RM 0103; **Exhibit A-5**, at 74:14-75:1.]

10.      It was also part of Montgomery's job to supervise preparation of toxicological samples to be sent to laboratories.  [*See*, **Exhibit A-4**, at RM 0103; **Exhibit A-5**, at 75:2-5.]

11.      Montgomery served as a major case advisor, and in terms of receiving supervision, he reported directly to the Chief Deputy Coroner or the Coroner.  [*See*, **Exhibit A-4**, at RM 0103 and RM 0104, Supervision Received; **Exhibit A-5**, at 77:16-24.]

12.      It was part of Montgomery's job to make recommendations for budgeting and expenditures mainly related to training funds, but if Montgomery saw other financial issues arise, or some financial aspect of an operation that could be handled better, Montgomery agreed he would raise it with his superiors.  [*See*, **Exhibit A-4**, at RM 0103; **Exhibit A-5**, at 75:6-77:15.]

13.      On or about September 13, 2006, Riber received complaints from both the Colorado Bureau of Investigation ("CBI") and the Lincoln County Coroner concerning Montgomery's rude and abrasive conduct at the scene of a multi-jurisdictional death, which Riber believed reflected poorly on the Douglas County Coroner's Office given that it is frequently called upon to collaborate with outside agencies on death investigations.  [*See*, **Exhibit A-1**, at ¶¶ 6, 7, and 8; Email exchange between Riber and Johnson, appended hereto as **Exhibit A-6;** Transcript of Deposition of Carrie Blackwell (f/k/a Fink), appended hereto as **Exhibit A-7**, at 160:15-24; Transcript of Deposition of Patricia Dunn, appended hereto as **Exhibit A-8**, at 185:21-191:15.]

14.      Steve Johnson from the CBI called Riber and reported that on September 12,

2006, at a death scene involving multiple jurisdictions, Montgomery had acted extremely unprofessionally toward one of the CBI evidence technicians, and also requested that Riber address Montgomery's inappropriate conduct with him.  [*See*, **Exhibit A-1**, at ¶ 6; **Exhibit A-6**.]

15.     Jennifer Nestor, the Lincoln County Coroner also called Riber and reported his rude and unprofessional conduct at the death scene, where Montgomery wanted to proceed without authorization from the CBI, refused to sign the crime scene log, and was very abrasive to representatives of the other agencies on scene.  [*See*, **Exhibit A-1**, at ¶ 7.]

16.     Riber met with Montgomery concerning his inappropriate conduct at the Lincoln County death scene, and Montgomery disclaimed any inappropriate conduct.  [*See*, **Exhibit A-1**, at ¶ 8; **Exhibit A-5**, at 212:12-213:21.]

17.     On October 23, 2006, the Douglas County Coroner's Office was contacted concerning the death of Jack Acree, and Coroner Investigator Carrie Fink ("Fink") investigated the death scene where it appeared that Mr. Acree may have had suicidal ideations.  [*See*, **Exhibit A-1**, at ¶ 12.]

18.     Dr. Ben Galloway ("Galloway"), the pathologist who conducts autopsies for Douglas County as an outside contractor, performed an autopsy on Mr. Acree and advised Riber that the manner and cause of death was a natural death due to arteriosclerotic heart disease, which is set forth in the Coroner's Report, the Death Certificate, and the Autopsy Report.  [*See*, **Exhibit A-1**, at ¶ 12; Coroner's Report, appended hereto as **Exhibit A-9**; Autopsy Report, appended hereto as **Exhibit A-10**.]

19.     Fink brought the Acree case file to Montgomery, and the two read the Sheriff's Department investigation reports together in detail.  [*See*, **Exhibit A-5**, at 87:1-89:8.]

20.     Fink and Montgomery only had access to the Sheriff's Department reports because of their official capacities as Coroner's Office employees.  [*See*, **Exhibit A-5**, at 89:9-14; 90:6-12; 108:6-109:1.]

21.     The only reason Montgomery had knowledge of the Acree investigation was by virtue of his position as Assistant Chief Deputy Coroner, and Montgomery admitted this at his deposition.  [*See*, **Exhibit A-5**, at 129:13-130:19.]

22.     Around November 10, 2006, Montgomery told Fink about his suspicions that Riber may have ruled Acree's death a "natural" in order to gain favor with the political community, which caused Fink to become concerned and discuss the issue with Mike French ("French"), the Sheriff's investigator who had investigated the Acree death.  [*See*, **Exhibit A-5**, at 123:6-124:15; **Exhibit A-7**, at 120:6-14; 124:1-128:4; 163:2-22; Transcript of Deposition of Robert Michael French, appended hereto as **Exhibit A-11**, at 137:19-138:2.]

23.     Approximately a week after the Coroner's Report was issued on November 9, 2006, Montgomery spoke to Dunn and told her that he did not believe Mr. Acree's death was a natural death, that he thought it should have been ruled a suicide, and that he thought the level of Atenolol in Mr. Acree's system should have been further tested.  [*See*, **Exhibit A-8**, at 100:20-101:22.]

24.     After Montgomery spoke to Dunn at least one additional time concerning testing on the Atenolol, Dunn again explained the reason why the Atenolol was not quantified (it is not a drug known to cause death), and repeatedly advised Montgomery to direct any concerns he may have about the investigation to Riber.  [*See*, **Exhibit A-8**, at 108:3-109:10.]

25.     In December of 2006, Montgomery, who was at work as Assistant Chief Deputy

Coroner, met with Riber and Dunn in Riber's office because he had concerns about the Acree case, and he was advocating that additional testing be done to determine the amount of Atenolol in Mr. Acree's system. [*See*, **Exhibit A-5**, at 82:13-84:25.]

26. At his deposition, Montgomery agreed that it was part of his job to raise concerns with the Coroner and the Chief Deputy Coroner if he believed there was a death investigation that was not being handled correctly in that office. [*See*, **Exhibit A-5**, at 96:23-97:3; 102:5-9; 110:11-15; 114:11-15.]

27. Montgomery testified that he shared his concerns about the Acree investigation with French and Lt. Brian Murphy ("Murphy") of the Douglas County Sheriff's Office, who had similar concerns. [*See*, **Exhibit A-5**, at 126:6-129:10; 137:23-140:5.]

28. French's communications with his superior in the Sheriff's Office caused a meeting to be called on December 5, 2006 between Sheriff's department command staff and Riber and Dunn to discuss the reason why Galloway had not quantified the level of Atenolol on Mr. Acree's system. [*See*, **Exhibit A-1**, at ¶ 13.]

29. Riber advised that his ruling on the cause and manner of death would remain natural since Galloway had advised him that the Atenolol was a noncontributory drug, had not been known to cause death, and was not contributory in this case; rather, Dr. Galloway had opined that Mr. Acree died due to an extensive medical history and a very bad heart. [*See*, **Exhibit A-1**, at ¶ 13.]

30. There were three or four occasions in the year preceding Montgomery's termination, the most recent of which took place on approximately March 23, 2007, on which Montgomery spoke with Dunn about personal checks that she and Riber had received from

Galloway in exchange for their assisting him with out-of-county autopsies (autopsies involving deaths outside of Douglas County). [*See*, **Exhibit A-1**, at ¶ 16; **Exhibit A-8**, at 165:13-168:4; Affidavit of Patricia Dunn, appended hereto as **Exhibit A-15**, at ¶ 3.]

31. Montgomery testified at his deposition that his speaking about Riber's and Dunn's assistance with out-of-county autopsies pertained to facilities that were within the Coroner's Office and that when he spoke with Dunn concerning this issue, he was doing so on the job and while he was at the office being paid. [*See*, **Exhibit A-5**, at 150:4-151:9.]

32. As an accommodation to its neighbors, Douglas County allows smaller, more rural counties that have no autopsy facilities to use the Douglas County facility for a nominal charge, and Galloway requests the assistance of trained autopsy assistants to help him perform out-of-county autopsies. [*See*, **Exhibit A-1**, at ¶ 2.]

33. Since 2002, Riber, a trained autopsy assistant, has assisted Galloway on several occasions with out-of-county autopsies that Galloway performed for other jurisdictions, and has received a nominal amount of money from Galloway in the form of personal checks from his private bank account in exchange for Riber's assistance. [*See*, **Exhibit A-1,** at ¶¶ 2 and 16.]

34. In the last four years, Dunn, who is also a trained autopsy assistant, has occasionally performed as an autopsy assistant for Galloway on out-of-county autopsies, in exchange for which she has received personal checks of nominal amounts from Galloway for her assistance. [*See*, **Exhibit A-1**, at ¶ 16; **Exhibit A-15**, at ¶¶ 2 and 3.]

35. Over a period of several months, beginning after January of 2007, multiple Coroner's Office employees complained about Montgomery's interactions with staff, his subordinates, his supervisory skills, and his inappropriate sharing of confidential personnel

matters with others, and Riber spoke with Montgomery on more than one occasion to Montgomery who did not believe he had done anything wrong. [*See*, **Exhibit A-1**, at ¶¶ 14, 15, 17, 18, 19, and 20; Memorandum from Lord to Riber, appended hereto as **Exhibit A-12**; Memorandum from Dunn to Riber, appended hereto as **Exhibit A-13**; Letter from Espinoza to Riber, appended hereto as **Exhibit A-14**.]

36.     In the spring of 2007, Montgomery verbally reprimanded another Coroner's Office employee in front of other staff who reported their discomfort in witnessing the exchange, and which Riber also considered to be inappropriate in terms of dealing with subordinates. [*See*, **Exhibit A-1**, at ¶ 17; **Exhibit A-8**, at 210:7-21; **Exhibit A-15**, at ¶ 4.]

37.     In approximately April of 2007, Fink came to Riber and reported her belief that Montgomery had acted inappropriately in discussing with her a confidential personnel issue concerning another employee's alleged off-duty behavior. [*See*, **Exhibit A-1**, at ¶¶ 14, 15.]

38.     In April of 2007, another coroner investigator, Carter Lord ("Lord"), expressed to Riber his frustrations concerning inequitable treatment he received from his immediate supervisor, Montgomery, and on April 23, 2007, Lord prepared a memorandum to Riber concerning the problems he was having with Montgomery. [*See*, **Exhibit A-1**, at ¶¶ 14, 15; **Exhibit A-12**.]

39.     On April 24, 2007, Riber received additional documentation from Dunn concerning a negative interaction between Montgomery and Lord. [*See*, **Exhibit A-1**, at ¶ 14; **Exhibit A-13**.]

40.     On May 16, 2007, Riber receiver another complaint from Jolie Espinoza, another Coroner's employee, who reported to Riber that Montgomery told her he had thirty days to

straighten out two fellow employees or they would be fired, which Espinoza thought constituted gossip, and that it was inappropriate for a supervisor to discuss personnel issues concerning other employees. [*See*, **Exhibit A-1**, at ¶ 18; **Exhibit A-14**.]

41. After receiving Espinoza's complaint about Montgomery on May 16, 2007, Riber decided to contact the Douglas County Human Resources Department and spoke with the manager, Laura Teague ("Teague"), to obtain advice on how to deal with the increasing issues with Montgomery. [*See*, **Exhibit A-1**, at ¶ 18; **Exhibit A-14**.]

42. Teague suggested that she, Montgomery, and Riber meet to discuss Montgomery's conduct. [*See*, **Exhibit A-1**, at ¶ 18.]

43. On May 23, 2007, Riber, Montgomery, and Teague met and discussed Montgomery's inappropriate conduct in terms of working with his subordinates (reprimanding another employee in front of other staff, discussing confidential personnel matters with other staff, and speaking with staff about their complaints to Riber), and Montgomery again took the position that he had done nothing wrong. [*See*, **Exhibit A-1**, at ¶ 19.]

44. On May 23, 2007, Riber placed Montgomery on administrative leave to allow him to consider the substance of the meeting over a long holiday weekend, and Riber, Montgomery, and Teague agreed to meet again after the weekend. [*See*, **Exhibit A-1**, at ¶ 20.]

45. On May 29, 2007, Riber, Montgomery, and Teague met and Riber once again expressed the importance of Montgomery not discussing personnel matters with other staff, to which Montgomery adamantly responded he had done nothing wrong. [*See*, **Exhibit A-1**, at ¶ 20.]

46. The meeting on May 29, 2007 solidified Riber's belief that Montgomery's

behavior would not change, and Riber felt that his only option at that point was to terminate Montgomery, which he did, and which is his right.  [*See*, **Exhibit A-1**, at ¶¶ 1 and 20.]

47.     Montgomery was an at-will employee of the Douglas County Coroner and Douglas County does not have a progressive discipline policy.  [*See*, **Exhibit A-1**, at ¶ 1; **Exhibit A-2**, at ¶¶ 3, 4, 5, and 6; **Exhibit A-3**, at DCCO.Montgomery 00047, 00075; **Exhibit A-5**, at 164:1-5; 166:11-18; 172:10-13.]

48.     Montgomery admits that on each occasion in which he spoke out, he was on the clock doing his job, and he was not speaking as a private citizen; rather, he was there speaking on the clock as the Assistant Chief Deputy Coroner.  [*See*, **Exhibit A-5**, at 134:5-12; 135:3-136:18.]

49.     Montgomery admits that it was a part of his job to speak to Riber about the business of his office.  [*See*, **Exhibit A-5**, at 137:10-12.]

50.     Montgomery admits that it was a part of his job to speak to Dunn about the business of the office.  [*See*, **Exhibit A-5**, at 137:13-15.]

51.     Montgomery admits that it was a part of his job to talk to Fink about the business in the office.  [*See*, **Exhibit A-5**, at 137:16-18.]

52.     Montgomery admits that it was a part of his job to talk to French because they were attending seminars in their capacity as County employees.  [*See*, **Exhibit A-5**, at 137:19-22.]

## IV.    ARGUMENT

**A.    Montgomery's First Amendment Retaliation Claim Fails Under the *Garcetti/Pickering* Test.**

The Tenth Circuit has identified a five-part test to analyze a freedom of speech retaliation claim by a government employee, known as the *Garcetti/Pickering* analysis. *See, Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007). "First, the court must determine whether the employee speaks pursuant to his official duties." *Brammer-Hoelter*, 492 F.3d at 1202 (citations omitted). If the Court finds that the "employee does not speak pursuant to his official duties, but instead speaks as a citizen," the court's analysis only then moves to the familiar *Pickering* inquiry. *Id*. If so, then the Court must address whether the subject of the speech is of public concern; whether the employee's interest in commenting on the issue outweighs the interest of the state as employer; and, finally, whether the employee's speech was a substantial motivating factor in a detrimental employment decision." *Id*. at 1202-1203. If the employee establishes that his speech was a substantial motivating factor in the adverse employment decision, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech. *Id*. at 1203.

The *Brammer-Hoelter* Court stated that "[t]he first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Id*. The question of whether speech is protected is a question of law, not of fact. *See, Connick v. Myers*, 461 U.S. 138, 148, n.7 (1983). Of course, where an employee fails to establish genuine issues of material fact as to whether his protected speech substantially motivated an adverse employment action, summary judgment is appropriate. *See, Deschenie v. Board of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1277 (10th Cir. 2007).

### 1. The Matters Montgomery Spoke About Fall Within Montgomery's Official Duties, Thus Barring Him From Asserting a Claim Under the First Amendment.

In *Garcetti v. Ceballos*, the United States Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006). The Court did not limit its holding merely to speech that occurs during normal business hours or in fora traditionally associated with an employee's job. Rather, the Court repeatedly employed the language *pursuant to their official duties*, which encompasses a large array of speech. *Id.*

Acknowledging that the "First Amendment protects some expressions related to the speaker's job," the Court held up the facts of the *Pickering* case as an illustration of the *Garcetti* ruling. *See, Garcetti,* 457 U.S. at 419-420 (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 573 (1968)). The *Pickering* case involved a letter to a newspaper written by a school teacher on the subject of education. *See, Garcetti*, 457 U.S. at 417. The Court noted that the *Pickering* speech was protected, despite being related to the speaker's job, because it had "no official significance and bore similarities to letters submitted by numerous citizens every day." *Id.* First Amendment protections dissipate when the speaker, going beyond merely writing to a newspaper, engages in conduct that has "no relevant analogue to speech by citizens who are not government employees." *Garcetti,* 457 U.S. at 424. The Court's contrast of the *Garcetti* and *Pickering* facts illustrates that when a public employee's speech has official significance, and is unique because it is made possible exclusively because of the speaker's role as part of the government, then that speech is made *pursuant to official duties* and is not protected by the First

Amendment. *See, Garcetti,* 457 U.S. at 424.

The Tenth Circuit has clarified this point in *Green v. Board of County Comm'rs*, 472 F.3d 794 (10th Cir. 2007). The *Green* case involved a lab technician who was responsible for conducting drug tests, and who believed that the testing procedure used by the government facility where she worked was inadequate and led to the reporting of false positives. *See, Green*, 472 F.3d at 796. In addition to discussions that Ms. Green had on this subject with her supervisors, she also "[w]ithout consulting her supervisors…contacted the manufacturer of the drug-testing equipment with questions about confirmation testing and arranged for a confirmation test by an outside hospital. She also spoke with representatives of the Department of Human Services about the client and the confirmation test and arranged for a case worker to transport the sample to the hospital." *Id.*

The Tenth Circuit held that, despite the fact that Green's communications were not "explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do." *Id.* at 800-01. Even though the content of Ms. Green's speech to the third parties did not concern "the job she was hired to do," the Tenth Circuit found it dispositive that since "part of her job was to interact with her supervisors, clients, and third parties regarding testing policies and issues," the speech was not protected. *Id.*

This Court also recognized the important practical and policy implications of the *Garcetti* decision. The Supreme Court "sought to avoid judicial oversight of communications between and among government employees and their superiors in the course of official business and displacement of managerial discretion by judicial supervision." *Green*, 472 F.3d at 801 (citing *Garcetti*). *Garcetti*, the Tenth Circuit held, "speaks in terms of 'official communications' that

may cause consequences for government, and notes that '[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id*. at 801. Therefore, according to *Garcetti*, any speech that "would be attributable to the [governmental entity]" falls outside of First Amendment protection. *Id*.

The Tenth Circuit's decision issued in the case of *Thomas v. City of Blanchard*, ___ F.3d ___, 2008 WL 5082293, No. 07-6197 (10th Cir. Dec. 3, 2008), also provides a useful contrast to the circumstances giving rise to this litigation. In *Thomas*, the plaintiff, a building code inspector, threatened to report the fraudulent completion of a certificate of occupancy to the state bureau of investigation, and eventually followed through on that threat. *See, Thomas*, 2008 WL 5082293, at *1-3. The key fact in *Thomas* was that the plaintiff went outside the chain of command, rendering it "the speech of a concerned citizen." *Thomas*, 2008 WL 5082293, at *6. In contrast and as discussed below, Montgomery's speech was within his chain of command and, accordingly, it should not be afforded First Amendment protection as it was speech made pursuant to his official duties and not that of a private citizen.

### a. Coroner's Ruling on Cause of Death.

In this case, Montgomery was speaking out about the Acree death investigation as part of his job as Assistant Chief Deputy Coroner. *See*, **SUF** at ¶¶ 3-12, 19-29, 48-52. Montgomery was a major case advisor, and his job included conducting death investigations, supervising investigations, reviewing cases, and working with the Douglas County Sheriff's Office in connection with investigations. *See*, **SUF** at ¶¶ 4-5, 7-8, 11. It was also Montgomery's job to report his activities and his subordinates' activities to the Chief Deputy Coroner and the Coroner. *See*, **SUF** at ¶¶ 6, 8, 11. Additionally, Montgomery's job included conferring with law

enforcement agencies related to investigations and supervising preparation of toxicological samples to be sent to laboratories. *See*, **SUF** at ¶¶ 9-10.

Significantly, Montgomery had knowledge of the Acree investigation only by virtue of his position as Assistant Chief Deputy Coroner. *See*, **SUF** at ¶¶ 20-21. He discussed his suspicions with Fink, the primary investigator, and subsequently spoke with Riber and Dunn about his concerns. *See*, **SUF** at ¶¶ 19-25. When Montgomery shared his concerns with French and Murphy of the Sheriff's Office, Montgomery was exchanging information as is typically part of investigations handled by the Coroner's Office and the Sheriff's Office. *See*, **SUF** at ¶¶ 5, 9, 27. Montgomery admitted that each time he spoke out he was doing so on the clock as the Assistant Chief Deputy Coroner, and part of his job was speaking to Riber, Dunn, and Fink about the business of the Coroner's Office. *See*, **SUF** at ¶¶ 48-52.

Montgomery's speech unquestionably bears official significance, and the matter about which he spoke out, namely, the Acree investigation, stemmed from and was the type of activity he was paid to do, as evidenced by not only his job description, but also his own deposition testimony. Montgomery's speaking out about the Acree death was only made possible due to his role as Assistant Chief Deputy Coroner, and he admits he spoke out when he was at work. His speech to the Chief Deputy Coroner and the Coroner clearly was within his chain of command and was thus, part of his official duties. In terms of sharing his concerns with French and Murphy, Montgomery's job was to speak with representatives of the Sheriff's Office, which is different than reporting to another outside agency. Accordingly, Montgomery's speech concerning the Acree matter is not entitled to First Amendment protection and the Court may

dismiss his First Amendment retaliation claim concerning this speech as a matter of law.[1]

### b. Assistance With Out-of-County Autopsies

Montgomery's speech concerning receipt of personal checks from Galloway for assisting with ("diening"[2]) out-of-county autopsies also should not be afforded First Amendment protection because such speech was as well part of his job. Montgomery again admitted that on each occasion in which he spoke out, he was speaking on the clock as the Assistant Chief Deputy Coroner. *See*, **SUF** at ¶¶ 48, 50.

Douglas County allows smaller, more rural neighboring counties that have no autopsy facilities to use the Douglas County facility for a nominal charge. *See*, **SUF** at ¶ 32. Dunn and Riber, who are both trained autopsy assistants, have assisted Galloway on occasion with out-of-county autopsies for which Galloway paid them nominal amounts of money with his personal checks. *See*, **SUF** at ¶¶ 32-34. Montgomery had asked Dunn on several occasions in the year previous to his termination about assisting Galloway with out-of-county autopsies, to which Dunn responded. *See*, **SUF** at ¶ 30. As Assistant Chief Deputy Coroner, it was part of Montgomery's job to make recommendations for budgeting and expenditures and Montgomery agreed that if he saw financial issues arise, or some financial aspect that could be handled better, he would raise the issue with his supervisors, which he did. *See*, **SUF** at ¶¶ 3, 12. Montgomery also admitted that his speech concerning diening pertained to facilities within the Coroner's Office, and that when he spoke with Dunn about his concerns, he was doing so while on the job and while he was at the office being paid. *See*, **SUF** at ¶ 31.

---

[1] It is of no consequence whether there are disputed issues of fact about whether the death should have been ruled natural or suicide. The fact is that the discussions were part of his official duties and that is dispositive.
[2] "Diening" is a slang term for assisting with autopsies, and involves a specialty of assisting with cutting activities and removal of organs.

Montgomery's speech concerning Riber and Dunn's diening was part of his job as he admitted during his deposition. Montgomery stated that if he saw a financial issue arise, it was his job to report it to his supervisors. Further, this speech was only made possible due to his conversations with Dunn, his immediate supervisor, and he admits his spoke out when he was on the clock at work. Accordingly, this speech is not subject to First Amendment protection.[3]

### 2. There Are No Facts Demonstrating Any Causal Link Between Montgomery's Alleged Acts of Speaking Out and His Termination.

The next step in the *Garcetti/Pickering* analysis requires Montgomery to come forward with evidence that the speech in question was a substantial motivating factor in the Coroner's decision to terminate him. "[T]he employee has the initial burden of establishing causation— that is, to show the exercise of constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). "[A]n employee must produce evidence linking the employer's action to the employee's speech." *Id.* "Speculation or hunches amidst rumor and innuendo will not suffice." *Maestas*, 416 F.3d at 1189. "[T]emporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision." *Id.* "[E]vidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." *Id.* (internal citations omitted).

Montgomery cannot establish that his speech was a substantial motivating factor in his termination as he cannot prove the requisite causal link between his alleged speaking out and his

---

[3] It matters not whether there are disputes about whether or not the diening constituted a conflict of interest. Instead, it is dispositive that such discussions were part of Montgomery's official duties.

termination. Most significantly, Montgomery spoke out about the Acree investigation in the time frame of late October to early December 2006, approximately six months before his termination at the end of May 2007, and there is a temporal disjoint between the speaking out and the termination. *See*, **SUF** at ¶¶17-25. With respect to the diening and alleged conflict of interest issue, Montgomery asked Dunn about her and Riber's assistance with out-of-county autopsies three or four times *in the year prior to his termination*, the last of which was in March 2007, over two months before his termination. *See*, **SUF** at ¶ 30. Quite simply, Montgomery cannot demonstrate the requisite causal link between his termination and his speech, and his claims that there is a connection between his speech and his termination amount to nothing more than mere speculation.

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Chavez v. City of Arvada,* 88 F.3d 861, 866 (10th Cir. 1996)). "However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson*, 181 F.3d at 1179 (citing *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (emphasis supplied)); *see also, Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (three-month period, standing alone, is insufficient to establish causation). Here, a retaliatory motive may not be inferred and Montgomery cannot come forward with any concrete evidence to establish causation. The record is devoid of any evidence linking the termination and the speech, and Montgomery's allegations that he was fired for speaking out constitute nothing more than speculation.

The undisputed facts demonstrate that Montgomery's conduct and interactions within the

office and with outside agencies were inappropriate and disruptive.  *See*, **SUF** at ¶¶ 13-16, 35-43.

On September 13, 2006, Riber was contacted separately by the CBI and the Lincoln County

Coroner concerning Montgomery's rude and abrasive conduct at the scene of a death.  *See*, **SUF**

at ¶¶ 13-15.  Montgomery had acted extremely unprofessionally toward one of the CBI evidence

technicians, wanted to proceed to the scene without waiting for authorization from the CBI,

refused to sign the crime scene log, and was abrasive to the other agencies on scene.  *See*, **SUF** at

¶¶ 13-15.  Riber met with Montgomery concerning his conduct and Montgomery disclaimed he

did anything wrong.  *See*, **SUF** at ¶ 16.

After receiving the complaint from Ms. Espinoza on May 16, 2007 concerning

Montgomery's inappropriate behavior continued into the spring of 2007, and Riber

became concerned about his interactions with subordinates and his discussion of confidential

personnel matters with other employees.  *See*, **SUF** at ¶¶ 35-41.  Multiple staff complained about

Montgomery's interactions with others, his supervisory skills, and his inappropriate sharing of

confidential information with others.  *See*, **SUF** at ¶¶ 35-40.  Examples of the inappropriate

conduct include reprimanding another employee in front of other staff, discussing another

employee's off-duty conduct, being harder on some subordinates than others, and telling another

employee he had to straighten out two other employees or they would be fired.  *See*, **SUF** at ¶¶

36-40.  Riber spoke with Montgomery as these issues came up and Montgomery continually took

the position he had done nothing wrong.  *See*, **SUF** at ¶ 35.

After receiving the complaint from Ms. Espinoza on May 16, 2007 concerning

Montgomery's sharing of confidential personnel matters, Riber sought advice from the Human

Resources Department.  *See*, **SUF** at ¶ 41.  When Montgomery was again spoken with about this

behavior, he continued to take the position that he had done nothing wrong.  *See*, **SUF** at ¶¶ 13-

15.]  It became clear to Riber that his only option was to terminate Montgomery.  *See*, **SUF** at ¶¶ 43-46.  The decision to terminate Montgomery rested solely with Riber, and was within his rights.  *See*, **SUF** at ¶¶ 1-2, 46-47.

Based upon the undisputed material facts, it is clear that Montgomery cannot meet his burden of demonstrating a causal relationship between his speech and his termination.  Rather, the unrebutted evidence demonstrates there were other factors leading to Montgomery's termination.  Most significantly,  the passage of several months between the alleged speech and the termination shows that the causal link is so remote that Montgomery's claims constitute nothing more than mere speculation.  Accordingly, Montgomery's First Amendment retaliation claim fails.

### B.    Defendant Riber Is Entitled to Qualified Immunity.

The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights.  *See, Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[Q]ualified immunity not only shields a defendant from liability, but is also intended to protect the defendant from the burdens associated with trial."  *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988).  "These burdens include distraction of officials from their governmental responsibilities, the inhibition of discretionary decision making, the deterrence of able people from public service, and the disruptive effects of discovery on governmental operations."  *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990).

Once a defendant asserts qualified immunity, the burden shifts to the plaintiff to demonstrate (1) the defendant's actions violated a constitutional or statutory right, and (2) the

infringed right at issue was clearly established at the time of the allegedly unlawful activity such that the defendant would have known his challenged conduct was illegal. *See, Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007). The record must clearly demonstrate that the plaintiff has satisfied his heavy two-part burden; otherwise, the defendant is entitled to qualified immunity. *See, Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).

In order to overcome the defense of qualified immunity, Montgomery must make a particularized showing that the law is sufficiently clear that Defendants would have known that their conduct was unconstitutional. *See, Patrick v. Miller,* 953 F.2d 1240, 1243 (10th Cir. 1992). Although the standard does not require an exact or precise factual correlation between existing law and the circumstances of the case at bar, it does require that courts agree that "certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). That is, it must be clearly established that a governmental officer's conduct "was unlawful *in the situation he confronted*." *Id.* at 202 (emphasis added). In order for the law to be sufficiently clear, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). The need for clearly established law is especially significant in First Amendment employment cases, where even the traditional balancing tests often yield uncertain results that government managers cannot accurately predict. *See, Scarborough v. Morgan County Board of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006).

In the instant case, Montgomery has failed to come forward with evidence to establish that the First Amendment protects his speech or that it was a substantial motivating factor in his

termination.  This alone requires the Court to find that Defendant Riber is entitled to qualified immunity.  Yet even if the Court were to conclude that Montgomery has met his burden with respect to some aspect of his claim, Riber should not be denied qualified immunity.  Montgomery can come forward with no case law sufficient to have put Riber on notice that terminating an employee who engaged in inappropriate and disruptive conduct was unlawful.  Riber's decision to terminate Montgomery was based upon repeated complaints from both outside agencies and coroner's office staff and, as such, Riber cannot be said to have violated any clearly established law.  Riber is therefore entitled to qualified immunity.

## V.     CONCLUSION

Montgomery's First Amendment retaliation claim fails because all of his speech was made pursuant to his official duties as Assistant Chief Deputy Coroner.  In both instances of speech, the record demonstrates that, as a matter of law, he spoke not as a private citizen, but as a government employee pursuant to his job duties.  Should the Court find that any aspect of Montgomery's speech was made as a private citizen, his speech does not survive the remainder of the *Garcetti/Pickering* analysis because Montgomery has entirely failed to meet his burden of showing that his speech was a substantial motivating factor in his termination and the record is devoid of any evidence linking the alleged speech and the termination.  Furthermore, even if Montgomery's claim survives the *Garcetti/Pickering* analysis, Riber is entitled to qualified immunity (leaving only the entity as a Defendant), as there is no clearly established law sufficient to put him on notice that terminating an employee for inappropriate and disruptive conduct could violate the First Amendment.  Accordingly, this Court should grant summary judgment in favor of Defendants.

Respectfully submitted,

s/ Michelle B. Whisler
**Michelle B. Whisler**
Senior Assistant County Attorney
Douglas County Attorney's Office
100 Third Street
Castle Rock, CO 80104
Telephone: (303) 660-7414
FAX: (303) 668-6596
E-mail: mwhisler@douglas.co.us
*Attorney for Defendant County*

s/ Gillian M. Fahlsing
**Gillian M. Fahlsing**
Senter Goldfarb & Rice, L.L.C.
1700 Broadway, Suite 1700
Denver, CO 80290
Telephone: (303) 320-0509
FAX: (303) 320-0210
E-mail: gfahlsing@sgrllc.com
*Attorney for Defendant Riber*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 31st day of December, 2008, I electronically filed a true and correct copy of the above and foregoing **COMBINED MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM BRIEF IN SUPPORT OF THEREOF** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

John A. Culver, Esq.
Seth J. Benezra, Esq.
jaculver@bc-law.com
sjbenezra@bc-law.com

Michelle B. Whisler, Esq.
mwhisler@douglas.co.us

s/ Stephanie Hood

00337847